LINCOLN COUNTY SHERIFF'S OFFICE AND LINCOLN COUNTY, NEBRASKA, APPELLANTS, V. HELENE HORNE, APPELLEE.
423 N.W.2d 412

Filed May 13, 1988.   No. 86-277.

Douglas J. Peterson, Deputy Lincoln County Attorney, for appellants.

Baskins & Boeshart, for appellee.

HASTINGS, C.J., WHITE, SHANAHAN, and FAHRNBRUCH, JJ., and BLUE, D.J.

HASTINGS, C.J.

Complainant-appellee was employed by the respondent Lincoln County sheriff's office as a deputy sheriff on January 3, 1963. On December 20, 1982, she filed a complaint with the Nebraska Equal Opportunity Commission (NEOC), alleging that the sheriff's office had violated the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 et seq. (Reissue 1978 & Cum. Supp. 1982), by discriminating against her on the basis of her sex.

The NEOC sustained her complaint and ordered the respondents, the sheriff's office and Lincoln County, to pay her a total of $5,228 in backpay. This represented the difference between the amount paid to her as a female office deputy and the amount paid male deputies for a period of 2 years prior to her resignation in October of 1982. She was also awarded attorney fees in the amount of $2,325. On appeal to the district court, the order of the NEOC was affirmed.

We review this matter de novo on the record. *Father Flanagan's Boys' Home v. Goerke*, 224 Neb. 731, 401 N.W.2d 461 (1987).

When complainant began her employment, she was told by the sheriff, Gordon Gilster, who is now deceased, that she would be paid at the same rate as the other deputy sheriffs. After July of 1964, however, she was consistently paid less than the other deputies, and by the time she quit in 1982, she was receiving approximately $225 to $250 less per month than the male deputies. Whenever Horne would bring this fact to the attention of Sheriff Gilster, he would usually respond that "[m]en are worth more than women," or would refuse to respond at all.

A particular source of frustration for Horne was the sheriff's refusal to send her to law enforcement training to obtain

certification. Completion of the law enforcement training program became a prerequisite for employment as a law enforcement officer on January 1, 1972. Neb. Rev. Stat. § 81-1414 (Reissue 1987). Although Horne was not required to go through the training, she felt that certification from the program would "justify a higher salary" and would lead to "[h]igher qualification" and "possible advancement." She stated that, had she become certified, "at least I'd have felt that maybe I had some prospects," but that without certification, "there was nothing ahead of me." The sheriff had turned down three or four of Horne's requests to attend the training, and he told her that he needed her to stay and run the office and that she was already a deputy and did not need the training.

On December 20, 1982, Horne filed a complaint with the NEOC. She alleged that the sheriff's office, through Lincoln County, had violated the Nebraska Fair Employment Practice Act by discriminating against her on the basis of her sex. The issues involved were whether she had been constructively terminated (i.e., forced to quit) by virtue of the discrimination, whether she had received unequal pay (compared to the male deputies), and whether she had been disparately treated by the denial of the opportunity to become certified as a law enforcement officer.

On November 11, 1983, the NEOC found reasonable cause to believe that there was discrimination based on sex. On February 16, 1984, an official complaint was filed with the NEOC.

A hearing was held before a hearing examiner of the NEOC on June 13, 1984. The hearing examiner received evidence and, on November 12, 1984, issued his recommended order and decision. The hearing examiner found that Horne had made out a prima facie case of intentional discrimination; specifically, that she had not been allowed to become certified, and thus eligible for higher pay, because she was female. The examiner further found that the sheriff's office had offered legitimate reasons for refusing Horne the opportunity to become certified—namely, that as an "office deputy," certification would do her no good—but that these reasons were in fact a pretext for discrimination.

At the close of the hearing, the parties had stipulated that Horne was withdrawing her request for wages from and after November 1, 1982, and waiving any right to reinstatement; that the only damages she was seeking "would be for a period of four years back from . . . December 12, 1982 [sic]."

Accordingly, the hearing officer denied any claim as to constructive termination and for lost pay beyond her termination date of November 1, 1982, but did award her discriminatory pay for the 2 years before 1982, as reflected in his recommended order and decision. This decision was adopted by the NEOC as its final order on March 8, 1985.

The respondents' appeal was heard by the district court, which affirmed the order of the NEOC. In their appeal to this court, they assign the following as error: (1) The district court erred in finding appellee established a prima facie case of discrimination, when appellee offered no evidence that she applied for a different position in the Lincoln County sheriff's office; and (2) the district court erred in finding the appellee produced evidence by a preponderance that she was intentionally discriminated against or that the legitimate nondiscriminatory reason offered by the Lincoln County sheriff was a pretext.

In an individual case of discrimination based on the disparate treatment theory, the employee alleging disparate treatment first has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. If the employee succeeds, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the treatment of the employee. If the employer carries this burden, the employee must then prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Father Flanagan's Boys' Home v. Goerke*, 224 Neb. 731, 401 N.W.2d 461 (1987); *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984).

This is the three-pronged analysis which has been promulgated by the U.S. Supreme Court and adopted by this court. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Zalkins Peerless Co., supra.*

The appellants' arguments are essentially assertions that this test was not met, and, therefore, an application of this analysis to the facts in this case is valuable.

In order to show a prima facie case of discrimination, Horne was required to show that she is a member of a protected class, that she was qualified for the training she sought, that in spite of her qualifications she was rejected, and that there is reason to believe this rejection was because she was a member of the protected class. See, *Father Flanagan's Boys' Home, supra*; *McDonnell Douglas Corp., supra.* Further, § 48-1119(3) (Reissue 1978) mandates that the discrimination must have been intentional. The prima facie case is meant to be flexible, and the elements may vary in each case. In *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978), the Court stated that "[t]he method suggested in *McDonnell Douglas* . . . was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Nevertheless, this analysis provides a structure in which to evaluate the sheriff's conduct.

As a female, Horne was a member of a protected class. §§ 48-1101 et seq.

Secondly, she must have been qualified to obtain certification as a law enforcement officer. Although not required to obtain certification (see § 81-1414(1)), there was no evidence that Horne was not qualified to receive the training. Horne was appointed as a deputy sheriff and was sworn in as such. Like the male deputies, she was issued a badge, a nameplate which read "Deputy Sheriff," tear gas, handcuffs, and identification cards showing her to be a deputy sheriff. Additionally, she wore a deputy's uniform which was—although she was required to sew hers herself—identical to the uniforms of the male deputies, and she carried a gun. Although there is some dispute as to whether Horne was a "law enforcement officer" as defined in Neb. Rev. Stat. § 81-1401 (Reissue 1981), there is little doubt that Horne was a sworn deputy and thus, at least in theory, eligible for the law enforcement training program. In spite of her qualifications as

a deputy sheriff, Horne's many requests to attend the training were rejected.

There was a preponderance of evidence which proved that the reason the sheriff denied her requests, despite her qualifications, was that she was female. All of the male deputies, including those who were not considered "patrol officers," had been allowed to seek certification at the training center. In contrast, the two female deputies were not allowed to attend the program, even though their job duties were very similar in nature to some of the male deputies' duties.

Moreover, the refusal to allow the females to be certified was shown to be intentional. Though approached several times by Horne, the sheriff denied her requests. The evidence showed that on many occasions the sheriff had directed comments toward Horne which were "sexist in nature." For instance, the other female deputy witnessed Horne cry "numerous times" because of comments made by the sheriff to Horne that "men were worth more than women." This evidence is enough to show by a preponderance that Horne was intentionally discriminated against on the basis of her sex.

The sheriff's office argues that Horne failed to establish a prima facie case of discrimination because she offered no evidence that she had applied for a position which required law enforcement certification. The sheriff's office cites several cases for the proposition that a plaintiff must prove that she applied for an available position for which she was qualified, but was rejected. Since Horne never applied to be a "patrol deputy" or any other position for which certification was required, the sheriff's office contends that she did not establish her prima facie case. This argument misses the point.

Horne did make an application for which she was qualified—that is, she applied to attend the training center. While *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and its progeny state that an element of a prima facie discrimination case is proof that the complainant "applied and was qualified for a *job* for which the employer was seeking applicants," (emphasis supplied) 411 U.S. at 802, it has been stressed that "facts necessarily will vary" in discrimination cases, and "the specification . . . of the

prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *Id.*, n.13. The eighth circuit likewise noted that "the requirements of a prima facie case will vary from case to case . . . ." *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1063 (8th Cir. 1975).

Moreover, Horne was in somewhat of a "Catch-22" situation. She was not eligible to apply for a position as, for example, a "patrol deputy," as the sheriff's office now claims she should have, until she was certified from the law enforcement training center. Yet the sheriff's office argues that showing denial of the opportunity to attend the law enforcement training does not constitute a prima facie case of discrimination.

Given the circumstances, Horne should not be required to show that she actually applied for a job position which required certification. The U.S. Supreme Court has resolved that "the . . . assertion that a person who has not actually applied for a job can *never* be awarded . . . relief cannot prevail." *Teamsters v. United States*, 431 U.S. 324, 365, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977). The Court recognized that, even in the absence of an express policy of discrimination, circumstances may excuse the requirement that the complainant actually apply for a job:

> The same message [of discrimination] can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, . . . his recruitment techniques, [or] his responses to casual or tentative inquiries . . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

431 U.S. at 365-66.

Considering the conditions in which Horne worked, e.g., the sheriff's "sexist" remarks and his denials of her requests for advancement through certification, it would seem unreasonable to impose upon Horne the burden of proving that not only was she turned down after applying for attendance at the training center, but was rejected in her attempts to obtain a

job requiring certification as well.

The ultimate burden of persuasion remains at all times with the complainant, and the employer bears only an intermediate burden of production. The employer is not required to prove the absence of discriminatory motive in order to eliminate the inference created by the complainant's prima facie case. It need only explain what has been done, or produce evidence of a legitimate, nondiscriminatory reason for the decision. It is sufficient if the employer's evidence raises a "genuine issue of fact" as to whether it discriminated against the employee. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981); *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984).

In this regard, the sheriff's office focused on the difference in job duties carried out by Horne and the male deputies and the assertion that because of these differences, Horne's attendance at the training center would not have been justified.

At the time Horne was hired, there were four deputies, a chief deputy, and the sheriff in the office. Horne was the only female until 1975. More personnel were added over the years, but the structure of the office remained essentially the same until 1976, when jailers, more deputies, and six "town deputies" were added. In 1980, radio dispatchers, deputy supervisors, more jailers, and an investigator were hired.

Although the deputies were all officially "deputy sheriffs," informally the deputies were sometimes referred to as the "tax deputy," the "civil process server," "town marshalls," "patrol deputies," and "office deputies."

Horne, who was occasionally referred to as an "office deputy," was responsible when she started in 1963 for keeping a record of all papers served, making returns on all papers, running the radio, answering the telephone, keeping the prisoners' records, keeping the jail register, figuring the prisoners' board and filing claims for such, and making calls and investigations (mostly in child abuse complaints). Over the years, her job responsibilities increased to include transporting prisoners and mental patients, and making arrests on warrants. When Jean Odbert was hired in 1975, Horne and Odbert

divided the job between them. Horne's job responsibilities continued to increase; she handled all of the foreclosures and sheriff's sales of real property. She also helped on the tax collection work, served civil process, and searched female prisoners.

Horne argues that many of the functions she performed were similar to the duties of the male deputies, and vice versa; for instance, making arrests on warrants, serving process, and transporting prisoners. A former deputy sheriff testified that Horne did "a lot of the same work" as the other deputies; that the tax deputy's job was "very much basically the same thing that [Horne] done [sic]," as was the civil process server's; and that Horne performed equal work which required skill, effort, and responsibility equal to that of one or more of the male deputies.

However, the former deputy sheriff also stressed that much of the job description was different. That is, Horne was not required to do "street work." He stated that there was a "definite difference in our positions as far as the things we have to do" and that he and the other deputies did "a lot of other stuff . . . that was not the same." Horne was not subject to being called out to handle arrests, patrol, conduct criminal investigations, etc.

These differences in duties between Horne and the male deputies are one reason the sheriff's office gives to explain the refusal to allow Horne to be certified; that is, Horne was not required to be certified, as she was not a "law enforcement officer" within the meaning of § 81-1401. Moreover, Horne was not in a position to be assigned as a "patrol deputy."

Section 81-1401(3)'s definition of "law enforcement officer" includes an employee of a county sheriff's office who "is responsible for the prevention or detection of crime or the enforcement of the penal, traffic, or highway laws of the state or any political subdivision thereof for more than one hundred hours per year and is authorized by law to make arrests . . . ." Horne admits that she does not fall within this definition and thus is not required to be certified. However, Horne requested certification so that she would be eligible for "possible advancement." The NEOC found that, without the

certification, Horne was "locked into secretarial/clerical duties wherein she lost essential advancement/increases in salary." Horne argues that because she was a female, she was not allowed to receive certification and thereby be assigned to patrol duties, whereby she would have received a higher salary.

In response, the sheriff's office essentially maintains that certification would have been a futile gesture on Horne's part. Even with certification, Horne would never have been qualified to "move up" as a patrol deputy, and, therefore, her attendance at the training center would have been more or less a waste of time.

Horne was born in 1907. Thus, at the time she first approached the sheriff with a request to be certified, she would have been 68, and by the time she finally gave up her battle in 1982, she was approximately 75. Although the county did not have mandatory retirement, the feasibility of Horne's becoming a patrol deputy at this age is minimal, even if she were certified. In addition, Horne was only 5 feet 1 inch tall, which was another factor which tended to diminish the possibility of her "advancing" to a street deputy position.

Roy Newton, who was chief deputy during the last 3½ years of Horne's employment, testified that had it been his decision, he would not have sent Horne to the school for certification. He stated that the training would not have benefited her or the department, because "To put her on the street [transfer her to a patrol deputy position] at her age . . . wouldn't have been the best decision." He also said that although he would have "considered" a request by Horne to be a patrol deputy, "her ability was in the office and not on the street," and her height would have been a factor against her. Even Horne conceded that in serving arrest warrants, normally "they sent Jean out to make the arrest, she's more impressive in appearance than I am." Since Newton agreed that it would not benefit Lincoln County to have the "office deputy" receive certification and that he would not have foreseen Horne in a patrol position, no good would have come from the sheriff's office's granting Horne the opportunity to attend training. Furthermore, she herself indicated that she was satisfied with her "office job," and, although she would have patrolled if she had been so

assigned, she did not necessarily want to change her position.

The sheriff's office met its burden of producing legitimate, nondiscriminatory reasons for denying Horne's requests to attend the law enforcement training program.

At this phase, Horne is given an opportunity to show that the stated reason is pretextual and not the true reason for the sheriff's decision. This could be shown through direct evidence, including discriminatory statements or statistics, or through comparative evidence. Casenote, *Making the Punishment Fit the Crime: The Eighth Circuit's Treatment of Dual Motive Cases—Bibbs v. Block*, 19 Creighton L. Rev. 941 (1986).

Much of the evidence on this point is similar to the evidence which proved Horne's prima facie case of discrimination. There is little doubt from the record that the sheriff believed that women were worth less than men. The issue is whether that was the real reason Horne was turned down for law enforcement training and, thus, for possible pay raises. Since the sheriff is deceased, the record can only reflect the observations of the sheriff's employees as to the atmosphere which existed in the office at the time of Horne's employment.

There was considerable testimony that, when confronted with the male-female pay discrepancy, the sheriff responded either with silence or comments as to the value of women. Apparently, the sheriff did not attribute the discrepancy to the fact that Horne was not, nor would she be, assigned to "street duty." Instead, inquiries as to the lower pay were met with remarks such as "[m]en are worth more than women."

Horne and Odbert were the only deputies not allowed to attend training. Although the sheriff's office now claims that this decision was made on the basis of Horne's lack of qualifications for actual "law enforcement" work, the reasons given at the time of Horne's requests were that she and Odbert were needed to run the office or that they were already deputies and did not need training.

It should be pointed out that all of the male deputies were allowed to attend the training, including the civil process server, who did "very, very, very little street work."

The final issue is whether these proffered reasons were the actual reasons for the disparate treatment or were merely a

pretext for discrimination.

A pure "pretext model" case depends upon a showing by the plaintiff that the articulated legitimate reasons are nothing but a pretext and that the disparate treatment would not have occurred *but for* the employer's discriminatory reasons. 19 Creighton L. Rev., *supra*.

Although complainant argued that all she wanted was to attend the law enforcement training school, it is not possible for us to turn back the clock. The only issue actually before us is whether the dollar award for disparate wage treatment should be affirmed. Throughout the record, the evidence seems conclusive that each time Horne asked for a raise, she was told by the sheriff that "men were worth more than women." It is difficult to conceive of a more blatant exhibition of sexual discrimination. As such, we believe it is clear that Horne has carried her burden of proving by a preponderance of the evidence that the nondiscriminatory reasons articulated by the respondents were a mere pretext for discrimination.

The judgment of the district court is affirmed. The complainant is awarded $1,000 for an attorney fee in this court. *Zalkins Peerless Co. v. Nebraska Equal Opp. Comm.*, 217 Neb. 289, 348 N.W.2d 846 (1984).

AFFIRMED.