LELAND C. ALLEN ET AL., APPELLANTS, V. AT&T TECHNOLOGIES, INC., FORMERLY KNOWN AS WESTERN ELECTRIC COMPANY, A CORPORATION, APPELLEE.

423 N.W.2d 424

Filed May 13, 1988. No. 86-467.

Clyde A. Christian, for appellants.

Thomas F. Hoarty, Jr., and Robert F. Rossiter, Jr., of Fraser, Stryker, Veach, Vaughn, Meusey, Olson, Boyer & Bloch, P.C., for appellee.

HASTINGS, C.J., CAPORALE, GRANT, and FAHRNBRUCH, JJ., and CHEUVRONT, D.J.

CAPORALE, J.

The 25 plaintiffs-appellants brought individual suits alleging that defendant-appellee, AT&T Technologies, Inc., formerly known as Western Electric Company, in violation of the Act Prohibiting Unjust Discrimination in Employment Because of Age, Neb. Rev. Stat. §§ 48-1001 et seq. (Reissue 1984), bypassed each of them for promotion to his former position of section chief because of age. Some of the plaintiffs additionally claim AT&T Technologies, in violation of § 48-1004(3), retaliated against them for filing a discrimination charge with the Nebraska Equal Opportunity Commission. Following a bench trial, the district court dismissed each of the petitions. In this appeal plaintiffs challenge the district court's (1) findings that AT&T Technologies successfully rebutted plaintiffs' prima facie disparate treatment case and that plaintiffs failed to discharge their ultimate burden of proof in that they did not establish that AT&T Technologies' stated reason for not promoting them was just a pretext for age-based discrimination

by virtue of disparate treatment; (2) failure to find plaintiffs had proved a disparate impact case; and (3) finding that none of the plaintiffs had established a retaliation case. We affirm.

## PROVISIONS OF ACT

To the extent relevant to this review, the act protects persons "at least forty years of age but less than seventy years of age," § 48-1003, from employment discrimination "because of such individual's age, when the reasonable demands of the position do not require such an age distinction." § 48-1004(1)(a). The act also makes it unlawful for an employer "to discharge, expel or otherwise discriminate against" one who has filed a charge or suit pursuant to its provisions. § 48-1004(3). The Equal Opportunity Commission is empowered to administer the act, § 48-1007, and to initiate actions; if the commission fails to do so, an aggrieved person "may bring a civil action in any court of competent jurisdiction for such *legal or equitable* relief as will effectuate the purposes" of the act. (Emphasis supplied.) § 48-1008. While the commission investigated these cases and concluded there was "reasonable cause" to believe AT&T Technologies violated the act, it instituted no action.

## BURDEN OF PROOF AND SCOPE OF REVIEW

Before proceeding with our analysis, we must first determine (1) where the burden of proof lies and (2) the scope of our review.

### *Burden of Proof*

As to the first question, we have said in connection with cases arising under the provisions of the Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48-1101 et seq. (Reissue 1984), that although the ultimate burden of persuasion by a preponderance of the evidence at all times remains with the plaintiff, the method of proof is for the plaintiff to prove a prima facie case; if the plaintiff succeeds in so doing, the defendant has the burden of articulating some legitimate, nondiscriminatory reason for its action. Should the defendant succeed in so doing, the plaintiff must establish by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. E.g., *Lincoln County Sheriff's Office v. Horne, ante* p. 473, 423 N.W.2d 412 (1988) (sex);

*Father Flanagan's Boys' Home v. Goerke*, 224 Neb. 731, 401 N.W.2d 461 (1987) (disability). We hereby adopt the same burden and method of proof for cases arising under the subject act. By so doing, we conform to the federal practice, *Halsell v. Kimberly-Clark Corp.*, 683 F.2d 285 (8th Cir. 1982), and *Cova v. Coca-Cola Bottling Co. of St. Louis*, 574 F.2d 958 (8th Cir. 1978), with respect to the federal Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. (1982), which the subject act closely parallels.

## Scope of Review

As to the second matter, we must bear in mind that these are not appeals from a determination made by the Equal Opportunity Commission, as was the situation in *Horne* and *Father Flanagan's Boys' Home, supra*, but, rather, are appeals from original actions instituted in the district court pursuant to the authority contained in § 48-1008. We can find nothing in the record which relates specifically to plaintiff Charles H. Scoles, so we cannot determine what relief he seeks. Seven of the plaintiffs, namely, Anton J. Cuda, Clarence F. Kabat, Bernard J. May, Russell T. Queen, Harold F. Redinger, Charles G. Rehberg, and Joseph F. Sinkule, had apparently retired prior to trial and thus seek only money damages. In addition, four plaintiffs, namely, Dennis D. Behrens, Donald E. Cox, James K. Murphy, and Joseph J. Novak, had been restored to the position of section chief, albeit not as soon as each thinks he should have been, and therefore also seek only money damages. The other plaintiffs, namely, Leland C. Allen, Eugene A. Bartunek, Rolland D. Beetison, Robert L. Donahoo, Jamie R. Fleming, Everest L. Kinloch, Jr., Thomas O. Larsen, John E. Malone, Page E. Nolan, Paul M. Quandahl, Robert K. Sundell, Harold L. Walker, and S.W. Wheeler, seek promotion, that is, a mandatory injunction and monetary damages.

The retired plaintiffs and restored plaintiffs present actions at law. In an appeal from such an action tried without a jury, this court presumes the controverted facts were decided by the trier of fact in favor of the successful party; accordingly, those findings will not be disturbed on appeal unless clearly wrong, it not being our province to resolve conflicts in or reweigh the evidence. *Kubista v. Jordan, ante* p. 244, 422 N.W.2d 78

(1988); *Kuehl v. Diesel Power Equip. Co., ante* p. 353, 422 N.W.2d 361 (1988).

However, the plaintiffs seeking a mandatory injunction present actions in equity, notwithstanding the fact they also seek monetary damages. *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry*, 227 Neb. 770, 420 N.W.2d 280 (1988). In an appeal from such an action, this court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court; provided, where the credible evidence is in conflict on a material issue of fact, it will consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Buell, Winter, Mousel & Assoc. v. Olmsted & Perry, supra.*

The complexities presented by the need to apply differing standards of review in a single appeal may be one of the many reasons Neb. Rev. Stat. § 25-703 (Reissue 1985) provides that only actions which might have been joined may be properly consolidated.

## EVIDENCE

In 1974 and 1975, AT&T Technologies suffered economic setbacks, forcing it to reduce its Omaha hourly work force by approximately 40 percent. Because of the diminished need for hourly labor, fewer supervisors, including those in the first-level management functioning as section chiefs, were required. The duties of a section chief include maintaining orderly manufacture and production, maintaining quality and efficiency in the work done, ordering inventory, computing the earnings of the employees, keeping attendance records, and the hiring and firing of people through the proper channels. The position requires a knowledge of the product and its quality, as well as a knowledge of the employees.

The number of section chief positions was reduced from 250 to 150. The plaintiffs were among the 100 individuals in the positions eliminated. Persons in those positions had the option of being demoted, taking early retirement, or terminating their employment with AT&T Technologies. Each of the plaintiffs opted for demotion. At the time, none of the plaintiffs questioned the decision that they would be among those

demoted; most of them testified that at the time of demotion they understood AT&T Technologies was suffering economically and that the reason for the demotion was economic, not based on poor performance. Many also testified they were told they would be promoted to their former position once economic conditions improved.

Although the demotions are not at issue, an understanding of the manner in which they were accomplished is helpful. In the beginning, when the bulk of the eliminations were made, AT&T Technologies selected those who had held their positions as section chief for the shortest periods of time. When further eliminations became necessary, AT&T Technologies demoted those with the poorest performance, in other words, the least effective workers.

Between 1970 and 1975, AT&T Technologies used a rating system for section chiefs whereby an individual's performance was rated as "outstanding," "good," or "limited." Only 20 percent of section chiefs achieved an "outstanding" rating; the remainder were rated as "good." The lowest 30 to 40 percent of the "good" section chiefs were demoted, as they were the least effective workers. Earlier practice, however, had been to promote or demote on the basis of length of service.

After 1975, economic conditions improved, and AT&T Technologies began expanding its Omaha work force. When the need for an additional section chief arose, a requisition was filed with AT&T Technologies' human resources committee. The committee then searched through AT&T Technologies' Omaha work force for possible candidates. Once the committee identified possible candidates, it reviewed the qualifications of each. A list of all former section chiefs still employed was also reviewed. Eventually, the committee selected the candidate it considered best and recommended that person to the "small staff," which consisted of several upper-level management employees. The small staff then made a final selection subject to the review of the general manager.

Five factors were used in evaluating each candidate: job experience, military service, education, inclusion on the "management potential inventory," and affirmative action considerations. No single factor controlled the selection; the

ultimate decision rested on a balancing of all the factors. As a position became available, those involved in the decisionmaking process pinpointed what the job required and determined whether a candidate's background provided what was needed. Positions were compared to the candidates; candidates were not compared to each other.

AT&T Technologies stated it adopted that procedure so that it might upgrade its supervisory staff and enhance the caliber of its personnel in order that it might remain competitive.

As we understand the evidence, the first two factors, job experience and military experience, are somewhat synonymous. The nature and type of supervisory experience were the significant considerations in evaluating job experience or military service; thus, mere longtime service as a section chief did not necessarily equate to the best type of supervisory experience.

The management potential inventory was prepared annually by a variety of first- through fourth-level managers for the purpose of identifying employees perceived to have management capabilities. Factors considered in identifying such persons included communication skills, problem-solving ability, creative management ability, the ability to provide direction, the ability to collaborate with others, the ability to help subordinates develop, the ability to engage in long-range planning, adaptability to change, the ability to balance responsibilities, and the ability to remain effective under adverse conditions, as well as social involvement.

While a particular level of education was not a requirement for the section chief's job, a college education was looked upon favorably, as it evidenced oral and writing skills, as well as the ability to learn. AT&T Technologies sponsored a program whereby employees attending college on their own time would be reimbursed for their tuition costs. One of the plaintiffs was informed by a supervisor that an education would be beneficial and that he should pursue one.

Although AT&T Technologies had no set timetable within which to meet affirmative action goals, it had "targets" it worked toward. One of its targets was to have 8 percent of its section chief positions filled by minorities and 20 percent by

women. Thus, sex and race were both factors considered when evaluating candidates for those positions.

It appears that by 1984, 75 section chief positions had been restored; 12 of these positions were filled by persons having had prior section chief experience, including the 4 plaintiffs mentioned earlier, and 21 positions were filled by lateral transfers. Thirty-one of the new section chiefs had military experience; however, it is unclear if that experience was supervisory in nature. Approximately 50 of those appointed as a section chief had been on the management potential inventory, 38 had college degrees, and 5 had a degree not requiring 4 years of schooling. As to the affirmative action statistics, in December 1976, 4.1 percent of the section chiefs were minorities and 2.3 percent were women. By 1977, 6.5 percent of the section chiefs were minorities and 2.4 percent were women; in 1978, 6.3 percent were minorities and 2.8 percent were women; in 1979, the percentages were 7.8 percent minorities and 5 percent women. In 1980, there were 8.4 percent minorities and 6 percent women. In 1981, the numbers were 6.3 percent and 6.3 percent, respectively. In 1982, it was 6.8 percent and 6.1 percent. In 1983, it was 9.7 percent and 9.1 percent. The record does not contain the 1984 statistics; neither does the record tell us the makeup of the 150 section chief positions retained throughout the period of time in question.

Plaintiffs are all white males and at least 40 years of age. Only three have college educations, most did not appear on the management potential inventory, and few had had military experience of a supervisory nature. However, plaintiffs' periods of service with AT&T Technologies ranged from 21 to 42 years, and they had been section chiefs for periods of from 4 to 28 years. Their performances as section chiefs had been rated as good, and some had perfect attendance records. While not one plaintiff testified that those appointed to the position of section chief were unqualified, most expressed the view that he, by virtue of his prior service as a section chief, was better qualified than any one of those appointed to the position.

Plaintiffs also questioned the emphasis on education, as it had not been considered important in the past. However, a witness called as a personnel management expert by AT&T

Technologies explained that the changing business environment made education important, as it exposed people to ideas and information outside their particular line of work and better equipped them to handle multiple demands and ambiguity. He pointed out that skills which were adequate at one time are not necessarily so in the present business environment.

This witness also testified that from a personnel management standpoint, AT&T Technologies' promotion process was a very good one and, in fact, may have been better than that used by most organizations. The consideration of multiple factors and the fact that no single factor was determinative made it difficult for the personal biases of the decisionmakers to creep into the process. Identifying people with management potential by the use of devices such as AT&T Technologies' management potential inventory is a common business practice.

## AGE CAUSE
### Disparate Treatment Theory

Plaintiffs first contend that AT&T Technologies' promotion practice treated them disparately because of their age. Generally, the disparate treatment theory of discrimination is applicable when the employer has treated some people less favorably than others because of an unlawful criterion such as age, sex, race, or disability. In such a case proof of a discriminatory motive is essential, although in some instances such a motive can be inferred from the mere fact of differences in treatment. *Akins v. South Cent. Bell Telephone Co.*, 744 F.2d 1133 (5th Cir. 1984).

Choosing to follow the lead of the federal courts, we hold that a plaintiff may thus establish a prima facie case of age discrimination by virtue of disparate treatment by showing that (1) she or he was in the protected age category, (2) she or he met the applicable qualifications, (3) despite those qualifications she or he was not promoted, and (4) other employees of similar qualifications, who were not members of a protected group, were promoted at the time plaintiff's request for a promotion was denied. *Cova v. Coca-Cola Bottling Co. of St. Louis*, 574 F.2d 958 (8th Cir. 1978), applied to a claim of age discrimination the elements required by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to prove a

prima facie case of racial discrimination under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1982). Accord, *Bell v. Bolger*, 708 F.2d 1312 (8th Cir. 1983). The *Cova* court also observed the federal age discrimination act "does not require that advanced age and substantial length of service entitle employees to special favorable consideration; it requires merely that an employee within the protected age group not be the subject of discrimination because of his or her age." 574 F.2d at 960. We conclude the same is true under the subject act.

As to the plaintiffs seeking promotion, our de novo review of the record convinces us that plaintiffs succeeded in establishing a prima facie disparate treatment case. Accordingly, we must also conclude that the district court's like finding is not clearly wrong as applied to those plaintiffs seeking monetary damages.

Our de novo review of the record also convinces us that AT&T Technologies articulated a legitimate nondiscriminatory reason for not promoting those plaintiffs seeking elevation to their former positions; AT&T Technologies, absent contractual or other constraints, may certainly upgrade its personnel in an effort to remain competitive. That determination again compels the conclusion that the district court's like finding is not clearly wrong as applied to those plaintiffs seeking monetary damages.

We thus reach the question of whether plaintiffs successfully rebutted AT&T Technologies' reason by showing that it is pretextual.

Again, we follow the lead of the federal courts and hold that to show pretext in an age discrimination by virtue of disparate treatment case, a task which merges with the ultimate burden of persuading the finder of fact that age was a factor, a plaintiff may show either that the "employment decision more likely than not was motivated by a discriminatory reason or by showing that the employer's proffered reason is unworthy of credence." *Bell v. Bolger, supra* at 1318. See *Harris v. Misty Lounge, Inc.*, 220 Neb. 678, 371 N.W.2d 688 (1985), for application of the same analysis in a sex discrimination case under the provisions of the Nebraska Fair Employment Practice Act.

The evidence establishes that AT&T Technologies' promotion process is a sound business practice, that factors considered in evaluating candidates are reasonably related to legitimate business concerns, and that the process is so designed as to attenuate the personal biases of the decisionmakers. While plaintiffs question the need for higher education, the fact remains the evidence establishes that better educated managers are better able to deal with the current business environment. More is written about the education aspect of these cases in the *Disparate Impact Theory* analysis which follows.

To the extent plaintiffs urge that AT&T Technologies' affirmative action program may have unjustly kept them from being promoted, we must observe that plaintiffs made no reverse discrimination claim. Moreover, a temporary, voluntary affirmative action plan designed to eliminate conspicuous racial imbalances in traditionally segregated job categories is valid. *Steelworkers v. Weber*, 443 U.S. 193, 99 S. Ct. 2721, 61 L. Ed. 2d 480 (1979). The evidence further establishes that AT&T Technologies has not reached its target for placing women in section chief positions; when the target percentage of minorities was exceeded, it was by less than 2 percent of its 8 percent goal.

AT&T Technologies' promotion practices are not illegitimate or arbitrary. The discrimination laws are not intended to diminish traditional management prerogatives. See *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). Nor should discrimination laws ensure the best selection of individuals for promotion; rather, they should ensure that the selection be free from discrimination. See *Casillas v. United States Navy*, 735 F.2d 338 (9th Cir. 1984).

We conclude from our de novo review of the record that the plaintiffs seeking promotion failed to discharge their ultimate burden of proof by failing to establish that AT&T Technologies' reason for not promoting them was pretextual. That again necessarily means that the district court's like finding is not clearly wrong with respect to those plaintiffs seeking monetary damages.

*Disparate Impact Theory*

Plaintiffs also assert that the emphasis AT&T Technologies places on education has a disparate impact upon them because persons 40 years of age and older are less likely to possess post high school educations than are younger persons. By so urging, plaintiffs attempt to bring themselves within the principles announced in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971). In that case, the U.S. Supreme Court held that Title VII of the Civil Rights Act of 1964 proscribes not only overt discrimination, but also practices which are fair in form but discriminatory in operation. Accordingly, it found violative of that act a policy which required a high school diploma and satisfactory performance on two professionally prepared aptitude tests as necessary prerequisites for employment and promotion not shown to have any relation to job performance.

One of the theories of discrimination growing out of *Griggs* has been designated the disparate impact theory. Federal courts have defined this theory as involving employment practices which facially appear to treat different groups neutrally but which in fact fall more harshly on one group than another, *Gilbert v. City of Little Rock, Ark.*, 722 F.2d 1390 (8th Cir. 1983), and which cannot be justified by business necessity, *Akins v. South Cent. Bell Telephone Co.*, 744 F.2d 1133 (5th Cir. 1984). Some courts have phrased this theory of discrimination in terms of having the plaintiff isolate " 'clearly identifiable employment requirements or criteria,' " which results in a less favorable impact on the protected group. *Hawkins v. Bounds*, 752 F.2d 500, 503 (10th Cir. 1985). See, also, *Am. Fed. of S., C., & Mun. Emp. v. State of Wash.*, 770 F.2d 1401 (9th Cir. 1985).

Unlike the situation in a disparate treatment case, proof of a discriminatory motive is not required to establish a disparate impact case. *Teamsters v. United States*, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977).

To prove a prima facie case of disparate impact in an age discrimination suit under the federal act, the plaintiff must show " '(1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or

disproportionate impact on persons of a particular [age] produced by the employer's facially neutral acts or practices.' " *Palmer v. United States*, 794 F.2d 534, 538 (9th Cir. 1986). The burden then shifts to the employer to show that the employment practice is related to job performance or justified by business necessity. *Gilbert v. City of Little Rock, Ark., supra.* See, also, *Griffin v. Carlin*, 755 F.2d 1516 (11th Cir. 1985) (employer forced to prove job relatedness of employment practices); *Hawkins v. Bounds, supra* (once burden shifts to employer, employer must prove practice mandated by business necessity; necessity connotes that exclusionary practice be of great importance to job performance to rebut prima facie case). Although pretext implies a state-of-mind concept, and, as noted earlier, intent is irrelevant in a disparate impact case, the plaintiff may nonetheless rebut the defendant's reason of business necessity by showing that an alternate practice lacking a discriminatory effect would satisfy the employer's legitimate interests. *Gilbert v. City of Little Rock, Ark., supra.* We adopt the same method of analysis for a disparate impact case brought under the provisions of the subject act.

AT&T Technologies suggests that a disparate impact analysis is inapplicable where the selection criteria are subjective or where an employer uses a multifaceted selection process. E.g., *Harris v. Ford Motor Co.*, 651 F.2d 609 (8th Cir. 1981) (concludes subjective evaluation systems cannot alone form the foundation for disparate impact cases); *Pouncy v. Prudential Ins. Co. of America*, 668 F.2d 795 (5th Cir. 1982) (states disparate impact analysis inappropriate to challenge multiple employment practices simultaneously). There are other federal jurisdictions, however, which hold to the contrary. E.g., *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183 (5th Cir. 1983), and *Hawkins v. Bounds, supra* (state disparate impact analysis applies to subjective criteria); *Griffin v. Carlin, supra* (concludes disparate impact theory can be used to challenge multicomponent promotion process).

In view of the state of the record, we need not, and therefore do not, determine which of those two conflicting views is to become the law of Nebraska. In order to recover under the disparate impact theory, plaintiffs must do more than merely

prove circumstances raising an inference of a discriminatory impact; they must prove the discriminatory impact at issue. *Palmer v. United States, supra.* That is, they must point to a clearly identifiable practice and prove its impact. *Hawkins v. Bounds, supra.*

Whether evaluating the evidence de novo on the record or whether reviewing the record to determine whether the district court's finding is clearly wrong, the conclusion which is compelled is that plaintiffs have failed to make even a prima facie showing that AT&T Technologies' use of the education factor in evaluating candidates for promotion has had a disparate adverse impact upon them. Even assuming for the purpose of this analysis, but not deciding, that the evidence raises an inference of a discriminatory impact, plaintiffs have failed to establish by a preponderance of the evidence that the use of the education factor prevented any one of them from being promoted. That is to say, there is no evidence from which any fact finder could conclude that but for the lack of a higher education any plaintiff would have been promoted. Such a failure to show a causal connection between the factor at issue and the lack of promotion defeats recovery under the disparate impact theory.

## RETALIATION CAUSE

Some of the plaintiffs (from 15 to 17 of them; the record is not clear) also assert that AT&T Technologies retaliated against them for filing complaints with the Nebraska Equal Opportunity Commission for not promoting them.

In order to prove a prima facie case of retaliation, a plaintiff must show she or he was not promoted following protected activities of which the employer was aware. See *Aguirre v. Chula Vista Sanitary Service*, 542 F.2d 779 (9th Cir. 1976).

There is simply no evidence which warrants such a conclusion. Even the prima facie burden is not met by showing merely that complaints were filed with the commission; that is all the evidence shows in this regard.

## DECISION

For the reasons discussed, the judgments of the district court are correct; therefore, they are hereby affirmed.

AFFIRMED.