IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


MEISINGER V. METROPOLITAN UTILITIES DIST.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


SHERRI A. MEISINGER, APPELLANT,

V.

METROPOLITAN UTILITIES DISTRICT, APPELLEE.


Filed March 3, 2015.    No. A-14-051.


Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Reversed and remanded for further proceedings.

Abby Osborn and Joy Shiffermiller, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Mark Mendenhall, of Metropolitan Utilities District of Omaha, for appellee.


IRWIN, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Sherri A. Meisinger appeals from the Douglas County District Court's grant of summary judgment in favor of Metropolitan Utilities District (MUD) on her gender discrimination claim arising out of her rejection from a supervisory promotion within MUD. We reverse the summary judgment order and remand for further proceedings.

BACKGROUND

Meisinger began her career at MUD in 1988 as an intern, and was hired full-time in 1990 in the drafting department. In 1995, she began working as a field engineer after receiving her Bachelor's degree in Design Engineering Technology. Meisinger was eventually promoted to Senior Engineer Tech, Design, where she has worked for the last 13 years. Meisinger's primary duty as a senior engineer tech is to design projects for the field engineers. Meisinger's position

required her to locate MUD's facilities based off paper, or "as-built" forms. Meisinger's duties also required her to work with outside entities such as the City, State, private entities, and contractors, as well as the field engineers, construction crews, and other divisions within MUD.

On January 27, 2010, MUD posted an inter-department informal notice for an opening for a supervisor of field engineering position (which would have been a promotion from Meisinger's pay grade). Included among the requirements in the posting were "two years of college in an area related to Engineering," but a 4-year engineering degree or engineering technology degree was preferred. The candidate was also required to have "utility locating experience in the last five (5) years preferable in an ongoing capacity but utility locator operator qualification is preferred[.]" Previously, the position did not require utility locating experience; the male individual retiring from the position was unable to utility locate and was never required to attempt to learn how to utility locate.

According to Meisinger, she first became aware the position was available the day MUD posted the informal notice on January 27, 2010. Meisinger was concerned with the statement regarding "ongoing" locating because although she had previous locating experience, the posting asked for "ongoing" experience. After she saw the posting, Meisinger asked for an opinion from her supervisor about that requirement, and he was of the opinion that she should not let the requirement stand in her way. Meisinger applied for the position on February 9.

Stephanie Henn, as the director of plant engineering, was the direct supervisor of the open position. According to Henn, she modified the job description to include utility locating experience in the last 5 years because she felt the supervisor needed to be able to accurately locate utility pipelines when responding to a "hit" or damage report. Henn stated that the previous supervisor did not have utility locating experience and could not accurately determine liability when responding to a hit. Henn explained that the supervisor of field engineering is one of the first MUD employees notified when a hit on a utility pipeline occurs, and works directly with MUD's Claims and Law Departments to determine liability. Henn also stated that she made the modification because the position supervises a significant number of utility locators (MUD employees whose primary job function is to locate utility pipelines) and field engineers (MUD employees whose primary job function is to inspect/coordinate MUD construction crews' work around utility pipelines, as well as locate utility pipelines). Henn felt that it was important that the supervisor of the utility locators and field engineers also be able to locate utility pipelines. Henn explained that she selected the 5-year timeframe because "It seemed reasonable to me that you can look back five years and you would be within -- in a five year period you're going to be pretty proficient at locating if you do it on a regular basis." Henn agreed that Meisinger had experience with MUD's locating functions and familiarity with MUD's gas/water main design standards. Henn testified that she knew Meisinger because Meisinger was working for MUD when Henn began working there, so Henn has worked her whole career with Meisinger.

Henn interviewed 11 applicants for the position, 8 men, and 3 women (Kris Hartley, Meisinger, and Shala Chevalier). On March 24, 2010, Henn made her recommendation to the board that Dave Stroebele, a male, be promoted to the position of supervisor of field engineering. In Henn's recommendation letter, she described the various reasons why she selected Stroebele, and why she did not select the other 10 candidates. With respect to Meisinger, Henn's letter stated that Meisinger did not meet one of the minimum job description requirements because she

had not utility located in over 10 years. Hartley and Chevalier both had ongoing locating experience and were operator qualified, and were not eliminated for that reason. Stroebele's promotion was approved in May 2010.

Stroebele did not have a 2-year degree at the time he was promoted. Henn testified she looked at college transcripts of the applicants to see if they had 2 years of engineering-type coursework. Henn testified that Stroebele had "some engineering coursework" and believed he had 2 years of college work. Stroebele's transcripts reflect he had approximately 7 to 8 classes "related" to engineering; the rest of his coursework appeared to be in general studies (e.g., "English Comp. I, "Human Sexuality," "Western Tradition I," etc.).

Henn testified that although she did not know who would be interested in the job or "speculate on what people are going to do," if there is a promotional opportunity, "knowing what the position is, I would think that people who aren't at that level yet might be interested . . ." Meisinger had previously applied for the position in 2003.

Meisinger believed her rejection was based on gender because: her credentials exceeded Stroebele's (besides the locating requirement), she could do the job, she had more seniority than Stroebele, and she felt that the job posting deliberately eliminated her. Meisinger testified in her deposition that Henn did not care what Meisinger had to say during the interview; Meisinger offered to take the utility locator operator qualified exam and expressed that she did have locating experience in the last 5 years, just "[n]ot equipment wise, but paper form" because her position required her to go into the field and locate MUD's facilities off their as-built forms. Meisinger's job is to design projects, so she does go out into the field and locate MUD's facilities off of "as-built" or "paper" forms. Meisinger would have to call a locator or field engineer to help her if she needed to locate something because she is not provided with the locating equipment; only certain employees within MUD are provided with the equipment. Meisinger indicated in her deposition she is able to use the locating equipment, but was "not given the chance" to prove it. During her interview with Henn, Meisinger told Henn that she would be willing to take the test "there and now" to prove that she could use the equipment from her past experience; according to Meisinger, Henn stated "it's not needed." Henn stated in her deposition that it would not make sense to allow Meisinger to take the written test when "there were other candidates who already met the minimum requirement so that seemed reasonable to me to -- to take one of the candidates who [was] already qualified."

Meisinger believed the locating experience component was added for the purpose of eliminating her "based on [Henn] not even acknowledging my locating experience or even any of my other qualifications. That's the only thing that was changed from the previous posting." Meisinger agreed in her deposition that current locating skills are a necessary job component of the supervisor of field engineer position, but she believed that once you learn how to locate "it's like riding a bike, you could pick it up very easily." Meisinger would have required some training time or updating time, whereas other candidates would not have required that. Meisinger provided examples of other job postings within MUD that required candidates to be certified in certain areas, but also permitted candidates to become certified within a certain time period after receiving the position (anywhere from 1 to 24 months depending on the position). Henn explained that she did not permit the position at issue the same option because "I knew when I was going to hire this person that I wanted them to be able to locate right away."

Meisinger believed that Stroebele was "groomed" for the position based on her observations during the previous year; Meisinger saw Stroebele at Henn's desk for half an hour every morning and at the end of the day, and did not observe the other senior techs doing that. Meisinger also heard the "talk" of the other senior techs because Meisinger's cubicle was right next to theirs at the time; some of the conversations amongst the techs were that Stroebele was getting certain "plan projects" that none of the other techs were given the opportunity to do.

Meisinger filed a complaint with the "NEOC" and "EEOC" on July 16, 2010. On June 28, 2011, the NEOC provided Meisinger with 90 days to file suit, and on September 12, 2011, she filed a complaint and request for jury trial in district court, seeking damages under the Nebraska Fair Employment Practice Act ("NFEPA"), Neb. Rev. Stat. § 48-1104 et. seq. (Reissue 2008). Meisinger alleged she was not promoted on the basis of her sex.

MUD filed an answer on October 11, 2011, denying the substantive allegations in Meisinger's complaint.

On November 27, 2013, MUD filed a motion for summary judgment. A hearing on MUD's motion was held December 10. MUD argued that summary judgment was appropriate because Meisinger could not meet her prima facie case to show that she was qualified for the position because she did not meet the minimum requirements required for the position, which stated that the candidate must have ongoing, recent utility locating experience in the last 5 years.

At the hearing, both MUD and Meisinger requested that the court take judicial notice of the trial testimony given in a separate gender discrimination case arising out of the same promotional decision, *Hartley v. MUD* (currently on appeal to this court at case No. A-14-0050), and the court stated that it did so. The court received into evidence Henn's candidate selection letter, the informal notice of the position, the job description minimum requirements, affidavits from Ron Reisner (Henn's supervisor) and Henn, Stroebele's college transcripts, deposition testimony from Stroebele, Henn, and Meisinger, and Meisinger's answers to interrogatories in the instant case as well as Hartley and Chevalier's answers to interrogatories in their separate cases.

The court ruled from the bench at the hearing, stating that Meisinger did not establish a prima facie case of discrimination, and that even if she had, MUD articulated a legitimate nondiscriminatory reason for its decision not to promote her over Stroebele. The court stated that it did not believe the adding of ongoing locating experience was a discriminatory act by MUD, and the fact that the previous employee in the position did not have such experience does not prevent an employer from adding it as an additional qualification. The court also found that the addition of the locating requirement eliminated a male candidate, which further showed "the lack of Ms. Meisinger being able to show the minimum qualification." The additional qualification also did not eliminate the other two female applicants, both of whom had locating experience. The court stated that Meisinger, in her deposition, acknowledged that she did not have the ongoing 5 years of locating experience (although she had previous experience), and although she stated she wanted to take the test and could obtain the operator qualification, the court did not believe that MUD would be required to allow her or a male applicant or anyone else to try to meet the minimum qualifications at the time of the posting.

On December 18, 2013, the court entered a written order granting MUD's motion for summary judgment.

Meisinger timely filed this appeal.

## ASSIGNMENT OF ERROR

Meisinger assigns four errors on appeal, which we consolidate and restate as follows: the trial court erred in granting summary judgment in favor of MUD because there were genuine issues of material fact regarding her claim for gender discrimination, and the court did not view the evidence in the light most favorable to her as the nonmoving party.

## STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *O'Brien v. Bellevue Pub. Sch.*, 289 Neb. 637, 856 N.W.2d 731 (2014). In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id.*

## ANALYSIS

*Judicial Notice of Testimony from Prior Case.*

We begin by addressing MUD's claim in its brief that the record on this appeal is insufficient for our review because Meisinger did not request in her praecipe for the bill of exceptions that the testimony from *Hartley v. MUD* (which the district court stated it took judicial notice of), be prepared for our review in the present appeal. We disagree, and instead conclude that the trial court plainly erred when it took judicial notice of that testimony.

At the summary judgment hearing, both MUD and Meisinger requested that the court take judicial notice of the testimony given in a separate but related case, *Hartley v. MUD*, case No. A-14-0050, and the court stated that it did so. Neb. Rev. Stat. § 27-201 (Reissue 2008) permits a court to take judicial notice of adjudicative facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court or (b) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. § 27-201(2). When cases are interwoven and interdependent and the controversy involved has already been considered and determined by the court in the former proceedings involving one of the parties now before it, the court has a right to examine its own records and take judicial notice of its own proceedings and judgments in the former action. *Strunk v. Chromy-Strunk,* 270 Neb. 917, 708 N.W.2d 821 (2006). Care should be taken by the court to identify the fact it is noticing, and its justification for doing so. *Id.* An entire trial record cannot be said to fall within the definition of a judicially noted fact as set out in § 27-201(2). *State v. Ryan*, 233 Neb. 74, 444 N.W.2d 610 (1989). See, also, *Strunk v. Chromy-Strunk, supra*. Further, "[a] judge cannot consider testimony taken at a previous trial in a subsequent trial unless such testimony is admitted into evidence." *Joyce S. v. Frank S.*, 6 Neb. App. 23, 30, 571 N.W.2d 801, 807 (1997) *disapproved of on other grounds by*

*Betz v. Betz*, 254 Neb. 341, 575 N.W.2d 406 (1998). The court in *Joyce S.* went on to note that Neb. Rev. Stat. § 27-804(2)(a) (Reissue 2008) provides for the admission of the testimony of a witness given at a prior proceeding if the terms of that statute are met, which statute section would be unnecessary if the court could simply judicially notice such evidence. Testimony must be transcribed, properly certified, marked and made a part of the record. *Everson v. O'Kane*, 11 Neb. App. 74, 643 N.W.2d 396 (2002).

In the instant case, the court simply took judicial notice of the testimony of Henn, Stroebele, and Hartley, in a separate gender discrimination trial against MUD, but such testimony was not transcribed, certified, marked, and made part of the record. See *Everson*, *supra*. The trial court was therefore in error to take judicial notice of it. However, that error is of no effect in our review since we reverse the trial court's summary judgment order on other grounds. We conclude that the evidence properly admitted at the summary judgment hearing, viewed in the light most favorable to Meisinger, shows that a genuine issue of material fact precludes summary judgment in favor of MUD.

*Summary Judgment*.

Our Supreme Court has adopted a three-part test, commonly referred to as the "*McDonnell Douglas* test," for purposes of construing the NFEPA in disparate treatment cases. See *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999). See also, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Although Meisinger argues in her brief that the *McDonnell Douglas* test does not apply because there was "direct evidence of discrimination," brief for appellant at 19, her argument is misplaced. Direct evidence of discrimination consists of "statements by a person with control over the employment decision sufficient to prove discrimination without inference or presumption." *Agnew*, *supra*, at 404, 590 N.W.2d at 695. The statements must reflect a "discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee" and "must be made by a person involved in the challenged decision." *Id*. As our antidiscrimination acts are patterned after federal law, we look to federal decisions for guidance. See *Ventura v. State Equal Opportunity Comm'n*, 246 Neb. 116, 517 N.W.2d 368 (1994). For example, in *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009), the Seventh Circuit concluded that a principal's derogatory remarks about Polish people, including that Hispanic students were "better than Polish" and "deserve[d] more than Polish people," and referring to the plaintiff as a "stupid Polack," spoke clearly of a discriminatory animus towards the plaintiff. See, also, *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1128 (8th Cir. 2008) (evidence of direct discrimination where a plaintiff informed her supervisor that she was pregnant, and her supervisor sighed and asked, "What are you going to do about the pregnancy; are you going to keep it?" and later stated that "with all the problems" that the plaintiff might be having soon, termination of her employment was "probably the best decision."). Our record is devoid of any statements by Henn or other MUD supervisors that would constitute direct evidence of gender discrimination against Meisinger, and thus, she must rely on indirect evidence to prove discrimination pursuant to the *McDonnell Douglas* framework.

The three-part *McDonnell Douglas* test has been set forth by our Supreme Court previously:

First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." . . . Third, should the defendant carry the burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Harris v. Misty Lounge, Inc.*, 220 Neb. 678, 682, 371 N.W.2d 688, 691 (1985) (citations omitted) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802, 93 S. Ct. at 1824, 36 L. Ed. 2d at 668 (1973).

In order to establish a prima facie case of gender discrimination, the plaintiff must show that he or she (1) is a member of a protected class, (2) was qualified to perform the job, (3) suffered an adverse employment action, and (4) was treated differently from similarly situated persons of the opposite sex. *Helvering v. Union Pac. R. Co.*, 13 Neb. App. 818, 703 N.W.2d 134 (2005). It is the plaintiff's burden to first demonstrate a prima facie case of discrimination. See *id*.

MUD argues that the evidence reflects that Meisinger cannot establish a prima facie case because she did not establish that she was qualified to perform the job, as she did not meet one of the posted minimum requirements of the position. However, Meisinger's allegation of discrimination is that she was qualified for the position, but MUD intentionally prevented her from establishing that she was qualified for the position. "The prima facie case is meant to be flexible, and the elements may vary in each case." *Lincoln Cnty. Sheriff's Office v. Horne*, 228 Neb. 473, 477, 423 N.W.2d 412, 416 (1988). In *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943, 2949, 57 L. Ed. 2d 957, 957 (1978), the Court stated that "[t]he method suggested in *McDonnell Douglas* . . . was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." It has been stressed that "facts necessarily will vary" in discrimination cases, and "the specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *Horne, supra*, at 478-79, 423 N.W.2d at 417 (quoting *McDonnell Douglas, supra*, at n.13). The Eighth Circuit has likewise noted that "the requirements of a prima facie case will vary from case to case. . . ." *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1063 (8th Cir. 1975).

The sole reason proffered by MUD for failing to consider Meisinger was that she did not meet the minimum requirements of the position, i.e., that Meisinger did not have locating experience in the past 5 years. The job posting stated that the candidate must have "utility locating experience in the last five (5) years preferable in an ongoing capacity but utility locator operator qualification is preferred[.]" Meisinger testified in her deposition that she did have locating experience in the past 5 years, as her position required her to go into the field and locate MUD's gas and water facilities using "as-built" or "paper" forms. Meisinger did not have ongoing locating experience using the actual locating equipment, as only certain employees within MUD are provided with that equipment, but the job posting as stated above does not limit the locating requirement to equipment-locating. Meisinger also testified that she could have, but

was denied, the opportunity to take the utility locator operator qualification test to prove she could use the equipment from her past experience, and Henn's only response was "it's not needed." Meisinger testified that Henn did not care what Meisinger had to say during the interview about her locating experience. And, Henn agreed in her deposition that Meisinger had experience with MUD's locating functions and familiarity with MUD's gas/water main design standards. In light of the flexible nature of the prima facie case as stated above, we conclude that Meisinger has established a prima facie case for discrimination. See *Lincoln Cnty. Sheriff's Office v. Horne*, 228 Neb. 473, 423 N.W.2d 412 (1988). MUD articulated legitimate, nondiscriminatory reasons for not promoting Meisinger and for adding the ongoing locating requirement; however, it then becomes a question of fact whether MUD's proffered reasons were pretextual, and there are inferences that can be drawn from the evidence that such reasons were pretextual. The male individual who previously held the supervisory position was unable to utility locate and was never required to learn how to utility locate by Henn. Henn promoted Stroebele, a male with less seniority and less education than Meisinger (and with less education and seniority than the other two women who were not selected for the position), and there appears to be a question of fact whether Stroebele himself even met the minimum requirements of the posted position. The position required "two years of college *in an area related to Engineering*," and Stroebele's transcripts in evidence reflect that prior to the promotional decision, he only had (arguably) between 7 or 8 classes specifically related to engineering-type of coursework; his other classes were in general study type of classes such as "English Comp. I," "Human Relations Skills," "Astronomy," and "Human Sexuality." We need not decide whether the evidence offered by Meisinger would be sufficient for her to prevail at trial. However, we conclude that Meisinger's evidence, viewed in a light most favorable to her, created a genuine issue of fact as to whether the reason offered by MUD for failing to promote her was a pretext for an impermissible discrimination. Thus, the trial court erred in granting summary judgment for MUD.

## CONCLUSION

For the foregoing reasons, we reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.