Finally, we find no merit to Pike's argument that the court erred in awarding future medical benefits to Damme.

AFFIRMED.

---

ROBERT O'BRIEN, APPELLEE, V. BELLEVUE
PUBLIC SCHOOLS, APPELLANT.
___ N.W.2d ___

Filed December 12, 2014.    No. S-12-843.

1. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.

2. ____: ____. In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence.

3. **Summary Judgment.** Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute.

4. ____. In the summary judgment context, a fact is material only if it would affect the outcome of the case.

5. ____. If a genuine issue of fact exists, summary judgment may not properly be entered.

6. **Termination of Employment.** Unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason.

7. **Termination of Employment: Public Policy: Damages.** Under the public policy exception to the at-will employment doctrine, an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy.

8. **Termination of Employment: Proof.** The plaintiff in a retaliatory discharge action retains the ultimate burden of persuading the fact finder that he or she has been the victim of intentional impermissible conduct.

9. **Employer and Employee: Proof.** To establish a prima facie case of unlawful retaliation, an employee must show (1) that he or she participated in a protected activity, (2) that the employer took an adverse employment action against him or her, and (3) that a causal connection existed between the protected activity and the adverse employment action.

10. **Employer and Employee: Termination of Employment: Circumstantial Evidence.** Because an employer is not apt to announce retaliation as its motive, an employee's prima facie case in a retaliatory discharge action is ordinarily proved by circumstantial evidence.

11.  **Termination of Employment: Time: Proof.** In a retaliatory discharge action, proximity in time between an employee's protected activity and discharge of the employee is a typical beginning point for proof of a causal connection.

12.  **Termination of Employment: Words and Phrases.** In employment law involving alleged impermissible termination, a "pretext" is found when the court disbelieves the reason given by an employer, allowing an inference that the employer is trying to conceal an impermissible reason for its action.

Petition for further review from the Court of Appeals, IRWIN, PIRTLE, and BISHOP, Judges, on appeal thereto from the District Court for Sarpy County, WILLIAM B. ZASTERA, Judge. Judgment of Court of Appeals affirmed.

Jeremy C. Jorgenson for appellant.

Laura K. Essay, Kevin R. McManaman, and Michael W. Khalili, of Knudsen, Berkheimer, Richardson & Endacott, L.L.P., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, MCCORMACK, MILLER-LERMAN, and CASSEL, JJ.

MILLER-LERMAN, J.
### NATURE OF CASE
Robert O'Brien, the appellant, filed a complaint in the district court for Sarpy County against Bellevue Public Schools (BPS), the appellee, alleging that he was wrongfully discharged from his employment as a carpenter with BPS because he reported the presence, demolition, and disposal of asbestos and asbestos-containing materials to his superiors at BPS. BPS moved for summary judgment. After a hearing, the district court granted summary judgment in favor of BPS. O'Brien appealed, and in a memorandum opinion, the Nebraska Court of Appeals affirmed the judgment of the district court. We granted O'Brien's petition for further review. Because we determine that BPS is entitled to judgment as a matter of law, we affirm.

### STATEMENT OF FACTS
O'Brien was an at-will employee of BPS from 2006 to 2009. He filed a complaint against his former employer in the district court on November 24, 2010, in which he generally alleged

he was fired in retaliation for reporting to his superiors the presence and removal of asbestos at the middle school where he worked.

BPS filed a motion for summary judgment, which the district court sustained. In its order filed August 14, 2012, the district court summarized the evidence and stated:

[I]n his deposition, [O'Brien] admits that he reported the suspected presence of asbestos to his supervisor on two occasions, but that he never reported violations of state and federal regulations. Morever [sic], the record reflects that there was documentation to show that [O'Brien's] work performance was not adequate. Based on the evidence, this Court finds that [BPS] terminated [O'Brien] for a legitimate, non-retaliatory reason unrelated to his reports of the suspected presence of asbestos. [O'Brien] was terminated from his position for his inability to cooperate with supervisors, inefficient work performance, and lack of punctuality. See, Exhibit #7. [O'Brien] stated in his deposition that during the meeting held to discuss his performance, he quickly became frustrated and stated that he believed he was going to be terminated for his aggression. [O'Brien] admitted that the topic of asbestos was not mentioned during the meeting, and that his frustration did not have anything to do with alleged reports he made to his supervisor regarding his asbestos concerns. Based on the aforementioned, this Court finds that [BPS] has met its burden to show that there are no genuine issues of material fact, and that summary judgment is appropriate.

O'Brien appealed to the Court of Appeals. O'Brien assigned as error on appeal that

the district court erred when it sustained BPS' motion for summary judgment because (1) the court's order was unclear whether it found (a) that O'Brien never reported to BPS that its demolition and disposal of asbestos was in violation of state and federal regulations, or (b) that O'Brien never reported to state and federal authorities those alleged violations, and that neither finding is sufficient to dismiss on summary judgment; and (2) a material

issue of fact exists as to whether BPS' reasons for termi-
nating O'Brien's employment was pretextual.

*O'Brien v. Bellevue Public Schools*, No. A-12-843, 2014 WL
1673287 at *4 (Neb. App. Apr. 29, 2014) (selected for posting
to court Web site).

In its memorandum opinion affirming the order of the dis-
trict court, the Court of Appeals recited the facts of the case
which we quote at length and for which we find support in the
summary judgment record. The Court of Appeals stated:

O'Brien was employed by BPS as a carpenter from
2006 to July 2009. Sometime between May and June
2009, he reported in one instance to his immediate super-
visor and in another instance to the vice principal of the
middle school in which he was working that he believed
that floor tiles and countertops he had been ordered to
demolish and remove contained asbestos.

In July 2009, O'Brien's supervisors completed an
annual performance review and found O'Brien "[N]ot
[A]dequate" in the areas of teamwork, quantity of work,
punctuality/attendance, reliability/dependability, consci-
entiousness, initiative, and cooperation.

On July 7, 2009, a meeting was held to discuss
O'Brien's review and job performance. The purpose of
the meeting was not to terminate O'Brien's employment.
O'Brien attended, along with Mike Potter (O'Brien's
immediate supervisor) and Matt Blomenkamp (the coor-
dinator for buildings and grounds and Potter's immedi-
ate supervisor). When Potter and Blomenkamp expressed
their concerns about O'Brien's job performance, O'Brien
repeatedly raised his voice and behaved in an agitated
and aggressive manner. At no time during the meeting
did O'Brien mention asbestos. O'Brien was dismissed
from work for the day, and a formal letter of reprimand
was given to O'Brien summarizing that meeting. O'Brien
signed that letter on July 12.

On July 13, 2009, O'Brien attended an informal
meeting with Jim McMillan, a BPS administrator, and
Blomenkamp. At the meeting, O'Brien admitted to poor
performance in the areas of reliability, punctuality, and

getting along with coworkers. He also apologized for his behavior at the July 7 meeting, acknowledging that he had "butted heads with Potter a few times" and that he should not have told Blomenkamp that he "wasn't one of the kids in the school district, not to speak to me like that." O'Brien did not mention asbestos during the July 13 meeting.

Blomenkamp sent O'Brien a letter, dated July 13, 2009, which stated: "This letter is in regard to your recent evaluation and past and present behavior as an employee for [BPS]. Your inability to cooperate with your supervisors, poor work performance, and refusal to be formally evaluated show a lack of judgment, respect and conscientiousness, all of which are essential functions of your position." The letter indicated that a meeting was scheduled for July 16 and that O'Brien would have an opportunity to be heard concerning his employment status.

On July 16, 2009, a final meeting was held. O'Brien, Blomenkamp, and an assistant superintendent attended. At the meeting, O'Brien admitted that reliability and punctuality were his "biggest downfalls" and that he had "butted heads" with Potter. O'Brien was informed that the meeting was his opportunity to address anything related to his employment. O'Brien did not mention asbestos during the meeting.

In a letter dated July 17, 2009, BPS terminated O'Brien's employment for his inability to cooperate with supervisors, inefficient work performance, and lack of punctuality.

On November 24, 2010, O'Brien filed a complaint claiming "wrongful discharge in violation of public policy including, but not limited to, the right to be free from retaliatory discharge for reporting violations of state and federal regulations pertaining to the demolition and disposal of asbestos and asbestos containing materials." O'Brien alleged that BPS retaliated against him after he reported actions by BPS which were unlawful under state or federal law and "which violations imperiled the health,

safety and welfare of [O'Brien], [O'Brien's] co-workers, and students and other employees of [BPS]."

In a deposition taken in May 2012, O'Brien testified, "I believe I was terminated because I raised to the attention of [BPS] administration that I was carrying out work orders that were HAZMAT related. When I made [the] complaints, I believe I was fired for making those complaints." O'Brien clarified that by "HAZMAT," he meant asbestos. O'Brien acknowledged that BPS had an asbestos policy and that he understood the policy to require employees to stop work and report to a supervisor if they saw asbestos. When asked if there was anything wrong with that policy, O'Brien answered, "No." O'Brien understood that after reporting asbestos, he was to let his immediate supervisor handle it, and then he would wait until he was given the next project. It was also O'Brien's belief that small amounts of asbestos, less than 3 square feet, could be removed without contacting a supervisor.

O'Brien further testified in his May 2012 deposition that in the summer of 2007, he complained to Potter that "we" had been removing asbestos countertops and that he had received another work order to remove asbestos flooring. According to O'Brien, Potter put his fingers to his mouth and told him to "shush," and Potter later told O'Brien that Potter himself had removed the flooring later that night. O'Brien did not observe Potter remove anything, but "[i]t was gone the next day." O'Brien testified that he believed he had committed an unlawful act by removing the countertops that contained asbestos, although he also acknowledged that he did not know they contained asbestos until told that by another employee. O'Brien testified that on another occasion in the summer of 2007, O'Brien realized that he was removing asbestos flooring. He reported it to a vice principal who happened to pass by the room, and he was instructed to stop work on the project. The flooring was later removed by asbestos abatement professionals. It should be noted that although O'Brien testified repeatedly during his deposition that

his reports about asbestos were made in the summer of 2007, he at one point indicates that he was terminated from employment shortly after making his last report, which suggests the reports about asbestos were made in 2009. During oral arguments before this court, counsel confirmed the reports were made in 2009.

In his deposition, O'Brien acknowledged that he had never been forced to remove asbestos against his will, nor was he asked to remove asbestos after reporting its presence. O'Brien denied ever being reprimanded or disciplined for reporting the presence of asbestos or suspected presence of asbestos or for not removing asbestos. O'Brien acknowledged that he was subject to annual reviews, and the "guys [he] worked with," were also subject to such reviews. However, according to O'Brien, this was the first negative annual performance review he had received during his 3½ years of employment at BPS. O'Brien stated that after his July 7, 2009, evaluation, "I thought I was on my way out . . . [b]ecause of the conversation I had with the contractor that I worked with on my last project with BPS . . . Blomenkamp had told [the contractor] that they had pulled me off that project, my last project was a Nature Outdoor Explore Classroom because of my — that I was aggressive, my attitude, aggressive attitude." O'Brien stated that he took a couple vacation days after he was pulled from that project, noting, "I got pulled off two projects right in a row and then I took two days vacation, day and half vacation, and when I came back there was a meeting on protocols of taking vacation." In discussing the July 7 evaluation meeting, O'Brien noted that Potter claimed that O'Brien "came across the room at him aggressively and he was in fear for his life," but O'Brien stated that all he did was turn toward him to ask him if he wrote "these things" in his evaluation. O'Brien acknowledged that Blomenkamp told him to calm down, and the evaluation was discussed. When told that he did not get along with supervisors or coworkers, O'Brien noted that he always helped his coworkers and that "[t]he only person

I didn't get along with was my supervisor." O'Brien confirmed that concerns were expressed regarding the efficiency and quality of his work, and punctuality, and he became frustrated "because I was being told I didn't get along with my co-workers, my quality of work." There was no mention of asbestos or reports of asbestos during this evaluation meeting, and O'Brien affirmed that his frustrations at the meeting had nothing to do with asbestos. He acknowledged receiving a formal letter of reprimand after this meeting. O'Brien had a subsequent meeting with McMillan and Blomenkamp, which meeting O'Brien recorded without their knowledge. O'Brien confirmed that he had stated during the recorded meeting that he needed to work on punctuality, reliability, and getting along with his peers better.

In the meeting on July 16, 2009, O'Brien stated he met with Blomenkamp and Doug Townsend, an administrator "right [beneath]" the superintendent of schools. O'Brien also recorded that meeting without the knowledge of other persons present. O'Brien stated that he took to the meeting his laptop with pictures documenting the work he had done over a 6- to 7-month period and that he had written a response to the written reprimand and "was going to present that and they said I didn't need to." O'Brien claimed he asked twice if he could read it and was told he did not need to do so. The following colloquy then took place:

"[Counsel for BPS:] I'm going to read a [transcribed] quote that was stated on the recording No. 2 at 2720, quote, I know that me and [Potter] have butted heads a few times along the way. Those are areas I need to work on for sure as well as I believe reliability that goes along with punctuality are my biggest downfalls I believe as an employee for [BPS] that I need to address.

"[O'Brien:] That sounds right, yes.

"[Counsel:] Do you think you were being disciplined due to asbestos at this point?

"[O'Brien:] Yes.

"[Counsel:] Did you bring any asbestos issues up at this point?

"[O'Brien:] It was in my letter that day. I never got to read it.

"[Counsel:] Did you say anything verbally regarding asbestos?

"[O'Brien:] Yes, to Mike Potter.

"[Counsel:] At this meeting?

"[O'Brien:] No, not at that meeting. He wasn't at that meeting."

*O'Brien v. Bellevue Public Schools*, No. A-12-843, 2014 WL 1673287 at *1-3 (Neb. App. Apr. 29, 2014) (selected for posting to court Web site).

In addition to the facts recited in the Court of Appeals' opinion quoted above, we note that at the hearing on the motion for summary judgment, BPS offered and the court received the affidavit of Mike Potter, O'Brien's immediate supervisor, to which BPS' policy regarding the abatement of asbestos was attached. The policy, labeled an "Operational Procedure," was issued by the "Assistant Superintendent for Buildings and Grounds." Under the general heading "**Toxic Substances Control Act - Asbestos Abatement**," the policy stated:

The purpose of this operational procedure is to state the district's philosophy or approach to meeting the requirements of the aforementioned act and to identify the specific duties to be performed by selected members of the administrative staff in meeting the requirements of the act and the district's philosophy.

The policy outlines BPS' approach to asbestos abatement, and then states that to effectively implement the general approach, responsibilities are grouped into seven areas. Under the area of "*Asbestos Abatement*," the policy provides:

Personnel in the district who have disturbed asbestos containing material or who need to disturb asbestos containing material are to contact the building principal. The building principal or his/her designee shall be responsible for contacting the district's "designated person"

before continuing. All asbestos incidences are to be under the supervision of the "designated person."

Regarding O'Brien's assignment of error regarding reporting, the Court of Appeals stated:

> The record is clear that O'Brien did not report violations of state and federal regulations either to BPS or to state and federal authorities. Rather, O'Brien simply reported the suspected presence of asbestos to his supervisor and to a building administrator, which he was expected to do pursuant to a school policy regarding asbestos.

*O'Brien v. Bellevue Public Schools*, 2014 WL 1673287 at *4.

The Court of Appeals then stated that O'Brien appeared to be arguing on appeal that

> he did not need to report *actual* violations of state and federal regulations related to asbestos for his wrongful discharge claim to survive; rather, he only needed to report a *potential* violation or *potential* asbestos hazard. And if he was fired for reporting a potential violation or potential asbestos hazard, [O'Brien claims] that violates public policy and qualifies as an exception to the at-will employment doctrine.

*Id*. at *5 (emphasis in original). The Court of Appeals recognized that O'Brien did not specifically assign the position reflected in this argument as error in his appellate brief, but his complaint raised the issue of wrongful discharge based on public policy, and because a summary judgment decision is based upon the pleadings and admitted evidence, the Court of Appeals reviewed the proceeding for plain error.

The Court of Appeals reviewed the jurisprudence regarding at-will employees, retaliatory discharge, and the public policy exceptions to the at-will employment doctrine, which we recite later in our analysis. In its opinion, the Court of Appeals treated O'Brien's claim as involving the reporting of the presence of asbestos, not irregularity in removal, and we agree that only reporting is relevant on appeal.

Although O'Brien did not plead any specific statutory or public policy exceptions in his complaint, the Court of Appeals noted that O'Brien argued in his brief on appeal that

certain federal statutes should be considered as providing a clear mandate of public policy. The three statutes cited to by O'Brien were from the following acts: (1) the Asbestos Hazard Emergency Response Act of 1986, 15 U.S.C. § 2641 et seq. (2012); (2) the Asbestos School Hazard Abatement Act of 1984, 20 U.S.C. § 4011 et seq. (2012); and (3) the Asbestos School Hazard Detection and Control Act of 1980, 20 U.S.C. § 3601 et seq. (2012). The Court of Appeals stated that

> for the sake of completeness under our plain error review of the public policy exception to at-will employment, we have reviewed the federal statutes [to which O'Brien refers on appeal] to determine whether they apply to the reporting of the presence of asbestos or in any way support a clear mandate of public policy related to the reporting of the presence of asbestos. We find that they do not.

*O'Brien v. Bellevue Public Schools*, No. A-12-843, 2014 WL 1673287 at *6 (Neb. App. Apr. 29, 2014) (selected for posting to court Web site).

The Court of Appeals concluded that no public policy exception to the at-will employment doctrine was available to an employee reporting the potential presence of asbestos in the workplace and that "O'Brien's employment termination falls under the employment at-will doctrine," meaning BPS could terminate O'Brien's employment at any time with or without reason. *Id*. at *8. The Court of Appeals therefore affirmed the determination of the district court, which had granted summary judgment in favor of BPS.

We granted O'Brien's petition for further review.

## ASSIGNMENT OF ERROR

On further review, O'Brien claims generally that the Court of Appeals erred when it affirmed the grant of summary judgment in favor of BPS.

## STANDARDS OF REVIEW

[1,2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as

to any material facts or the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Gaytan v. Wal-Mart, ante* p. 49, 853 N.W.2d 181 (2014). In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Id.*

## ANALYSIS

O'Brien claims that the Court of Appeals erred when it affirmed the district court's order granting summary judgment in favor of BPS. O'Brien was an at-will employee at BPS, which generally means he could be terminated at any time for any reason, subject to certain public policy exceptions. Although the Court of Appeals examined certain federal statutes and concluded that they did not provide a public policy exception to the at-will employment doctrine, our disposition of this case does not depend on such analysis. For the purposes of this opinion, we will assume but not decide that an action may be brought under the public policy exception to the at-will employment doctrine based on the federal asbestos statutes and that O'Brien satisfactorily proved a prima facie case of retaliatory discharge. However, as reflected below, BPS produced undisputed evidence articulating a legitimate, permissible reason to discharge O'Brien, and even granting O'Brien all favorable inferences from the undisputed evidence, O'Brien presented no evidence that BPS' articulated explanation was pretextual and not the true reason for its decision. Accordingly, BPS was entitled to judgment as a matter of law and the Court of Appeals did not err when it affirmed the district court's order granting summary judgment in favor of BPS.

[3-5] Because this case was decided on a motion for summary judgment, we set forth legal principles applicable to a motion for summary judgment. Summary judgment proceedings do not resolve factual issues, but instead determine whether there is a material issue of fact in dispute. *Brock v. Dunning*, 288 Neb. 909, 854 N.W.2d 275 (2014). In the summary judgment context, a fact is material only if it would

affect the outcome of the case. *Id*. If a genuine issue of fact exists, summary judgment may not properly be entered. *Id*. As noted above, on appeal, we give O'Brien as the nonmoving party the benefit of all reasonable inferences. See *Gaytan v. Walmart*, *supra*.

[6,7] It is undisputed that O'Brien was hired on an at-will basis. The general rule in Nebraska is that unless constitutionally, statutorily, or contractually prohibited, an employer, without incurring liability, may terminate an at-will employee at any time with or without reason. *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014). However, we have recognized a public policy exception to the at-will employment doctrine. *Id*. Under the public policy exception, an employee may claim damages for wrongful discharge when the motivation for the firing contravenes public policy. *Id*. Regarding the public policy exception, we have stated that

> it is important that abusive discharge claims of employees at will be limited to manageable and clear standards. The right of an employer to terminate employees at will should be restricted only by exceptions created by statute or to those instances where a very clear mandate of public policy has been violated.

*Ambroz v. Cornhusker Square Ltd*., 226 Neb. 899, 905, 416 N.W.2d 510, 515 (1987). We have applied the public policy exception in various contexts. See *Jackson v. Morris Communications Corp*., 265 Neb. 423, 657 N.W.2d 634 (2003) (discussing cases where we have applied public policy exception and determining in that case that public policy exception applied when employee had been discharged for filing workers' compensation claim).

[8] In cases involving allowable claims of retaliatory discharge, we have applied the three-tiered burden-shifting analysis that originated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). See *Riesen v. Irwin Indus. Tool Co*., 272 Neb. 41, 717 N.W.2d 907 (2006) (collecting cases). The cases sometimes use the language of alleged "discrimination" interchangeably with the language of "impermissible conduct." Regarding this burden-shifting analysis, we have stated:

The following procedure is utilized under the three-tiered allocation of proof standard: First, the plaintiff has the burden of proving a prima facie case of discrimination. See [*Father Flanagan's Boys' Home v.*] *Goerke*[, 224 Neb. 731, 401 N.W.2d 461 (1987)]. Second, if the plaintiff succeeds in proving that prima facie case, the burden shifts to the defendant-employer to articulate some legitimate, nondiscriminatory reason for the plaintiff's rejection or discharge from employment. See *id*. This burden is a burden of production, not of persuasion. See *Lincoln County Sheriff's Office v. Horne*, 228 Neb. 473, 423 N.W.2d 412 (1988). The employer need only explain what has been done or produce evidence of a legitimate, nondiscriminatory reason for the decision. *Id*. It is sufficient if the employer's evidence raises a genuine issue of fact as to whether it discriminated against the employee. *Id*. ""'If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted" . . . and "drops from the case . . . ."'" (Citation omitted.) [*Father Flanagan's Boys' Home v.*] *Agnew*, 256 Neb. [394,] 402, 590 N.W.2d [688,] 694 [(1999)], quoting *St. Mary's Honor Center* [*v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)].

Third, assuming the employer establishes an articulated nondiscriminatory reason for disparate treatment of an employee, the employee maintains the burden of proving that the stated reason was pretextual and not the true reason for the employer's decision; i.e., that the disparate treatment would not have occurred but for the employer's discriminatory reasons. *Lincoln County Sheriff's Office, supra*.

*Riesen v. Irwin Indus. Tool Co*., 272 Neb. at 47-48, 717 N.W.2d at 914. At all times, the plaintiff retains the ultimate burden of persuading the fact finder that he or she has been the victim of intentional impermissible conduct. See *Helvering v. Union Pacific RR. Co*., 13 Neb. App. 818, 703 N.W.2d 134 (2005). See, also, *Harris v. Misty Lounge, Inc*., 220 Neb. 678, 371 N.W.2d 688 (1985).

We have not previously determined whether to allow an action for retaliatory discharge under the public policy exception to the at-will employment doctrine when an employee alleges that he or she has been discharged for internally reporting the presence or suspected presence of asbestos. O'Brien urges us to recognize a public policy exception to the at-will employment doctrine under such circumstances, and in support of his argument, he points to three federal statutes that he asserts support a manageable and clear mandate of public policy related to the reporting of the presence of asbestos. See, Asbestos Hazard Emergency Response Act of 1986, 15 U.S.C. § 2641 et seq.; Asbestos School Hazard Abatement Act of 1984, 20 U.S.C. § 4011 et seq.; and Asbestos School Hazard Detection and Control Act of 1980, 20 U.S.C. § 3601 et seq.

We need not decide whether there is a public policy regarding internally reporting the presence or suspected presence of asbestos pursuant to an employer's policy in this case because, even assuming the existence of such policy and taking all inferences in favor of O'Brien, BPS is entitled to judgment as a matter of law.

*O'Brien's Prima Facie Case.*

[9] To establish a prima facie case of unlawful retaliation, an employee must show (1) that he or she participated in a protected activity, (2) that the employer took an adverse employment action against him or her, and (3) that a causal connection existed between the protected activity and the adverse employment action. *Trosper v. Bag 'N Save*, 273 Neb. 855, 734 N.W.2d 704 (2007).

With respect to the first element of a prima facie case, as stated above, we will assume without deciding for the purposes of this opinion that O'Brien was engaged in a protected activity when he reported the presence or suspected presence of asbestos to his employer, as he was required to do under his employer's policy. With respect to the second element, it is undisputed that O'Brien suffered an adverse employment decision when he was terminated on July 16, 2009.

[10,11] With respect to the third element of a prima facie case, a causal connection, we have recognized that because an employer is not apt to announce retaliation as its motive, an employee's prima facie case is ordinarily proved by circumstantial evidence. See *Riesen v. Irwin Indus. Tool Co.*, 272 Neb. 41, 717 N.W.2d 907 (2006). The Eighth Circuit Court of Appeals discussed the possibility that temporal proximity between protected activity and an adverse employment action can be sufficient to circumstantially demonstrate causality. See *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827 (8th Cir. 2002). Proximity in time between the protected activity and discharge is a typical beginning point for proof of a causal connection. See *Riesen v. Irwin Indus. Tool Co., supra*.

Reviewing the evidence favorably to O'Brien, we examine the temporal proximity between O'Brien's reports of the presence or suspected presence of asbestos and his termination of employment. O'Brien made his first report of asbestos in May 2009, and he made the second report in the second week of June. O'Brien's annual written evaluation is dated July 6, 2009, and he had a meeting regarding his evaluation with Matt Blomenkamp, Potter's immediate supervisor, and Potter on July 7. Another meeting was held on July 13, with Blomenkamp and James McMillan, a BPS administrator, regarding O'Brien's conduct at the July 7 meeting. After the July 13 meeting, Blomenkamp sent a letter dated July 13, 2009, to O'Brien stating that he was being placed on administrative leave. A final meeting was held on July 16, with Blomenkamp and Doug Townsend, a BPS assistant superintendent, and after this meeting, Blomenkamp sent O'Brien a letter informing him that he was terminated from his employment. For purposes of summary judgment, we consider the interval between O'Brien's second report of potential asbestos in the second week of June and his termination of employment to be sufficient for summary judgment purposes to establish a causal connection between his reports of suspected asbestos and his termination of employment. Thus, O'Brien successfully proved a prima facie case of impermissible termination of employment.

*BPS' Justification for Discharge.*

The burden shifted to BPS to articulate some legitimate, permissible reason for O'Brien's discharge from employment. See *Riesen v. Irwin Indus. Tool Co., supra*. In order to meet the requisite burden, the employer need only explain what has been done or produce evidence of a legitimate, permissible reason for the decision. *Id*.

BPS offered evidence to show that it terminated O'Brien's employment due to his poor job performance. As an employee of BPS, O'Brien was subject to annual evaluations, and the July 7, 2009, meeting was set as the yearend evaluation. From the time that O'Brien was employed by BPS from 2006 to July 2009, O'Brien had received three annual evaluations. O'Brien's written evaluation was dated July 6, 2009, and it covered the period from June 30, 2008, to June 30, 2009. It was the periodic yearend evaluation, not triggered by any event. The written evaluation stated that O'Brien was "Not Adequate" in the areas of teamwork, quantity of work, punctuality and attendance, reliability and dependability, conscientiousness, initiative, and cooperation.

On July 7, 2009, a meeting was held to discuss O'Brien's annual evaluation and job performance. O'Brien attended the meeting, along with Potter and Blomenkamp. The purpose of the July 7 meeting was not to terminate O'Brien's employment. However, when Potter and Blomenkamp expressed their concerns about O'Brien's job performance, O'Brien grew frustrated and raised his voice. O'Brien was dismissed from work for the day. The topic of asbestos was not mentioned by O'Brien or BPS at the July 7 meeting.

O'Brien was given a formal letter of reprimand dated July 7, 2009, from Blomenkamp summarizing the July 7 meeting. The formal letter of reprimand stated:

> Tuesday, July 07, 2009 a meeting was scheduled in . . . Potter's office to discuss your year-end evaluation. After reading the form you became upset. You started to criticize . . . Potter, raising your voice and stepping toward him aggressively. I asked you to calm down and to lower your voice. You ignored my request and continued

to speak to . . . Potter in an inappropriate manner. Again, I asked you to calm down. At that time you directed your argument towards me. I tried to explain to you that you were not being fired, but that this meeting was to address areas of concern . . . Potter and I had with your job performance, including efficiency, quality of work, and being punctual. In each instance, you argued that . . . Potter wasn't doing his job, you were in no way in the wrong, and that I didn't have the experience or expertise to evaluate your job performance. As we continued to talk, you again became agitated, raising your voice and approaching . . . Potter in an aggressive manner. Again, I told you to sit down and act appropriately or you would be sent home. You didn't follow my direction. I asked you a second time to calm down. You again ignored me. At that time I told you to go home and that you'd be paid for the day. As you walked out of the office, you continued to speak to both [Potter] and I inappropriately. A few minutes later, you returned to the office and tried to quarrel with the both of us. I again told you to go home. After an array of inappropriate comments and criticisms I asked you to leave for a third time. You then left the transportation building.

Although there is evidence in the record that O'Brien behaved in an aggressive manner toward Potter, there is also evidence in the record tending to minimize the encounter. On July 12, O'Brien signed the letter indicating that he was aware that a copy would be placed in his file.

On July 13, 2009, O'Brien attended a meeting with Blomenkamp and McMillan. At the July 13 meeting, O'Brien admitted to poor performance in the areas of reliability, punctuality, and getting along with coworkers. He also apologized for his behavior at the July 7 meeting. O'Brien did not mention asbestos during the July 13 meeting.

After the July 13, 2009, meeting, Blomenkamp sent O'Brien a letter dated July 13, 2009, which stated in part:

This letter is in regard to your recent evaluation and past and present behavior as an employee for [BPS]. Your

inability to cooperate with your supervisors, poor work
performance and refusal to be formally evaluated showed
a lack of judgment, respect and conscientiousness; all of
which are essential functions of your position.

The letter informed O'Brien that another meeting would be
held on July 16 and that at the meeting, O'Brien would have
the opportunity to be heard regarding his employment status.
O'Brien was also placed on administrative leave on July 13.

On July 16, 2009, a final meeting was held. O'Brien,
Blomenkamp, and Townsend attended the meeting. At the
July 16 meeting, O'Brien admitted that reliability and punc-
tuality were his "biggest downfalls" and that he had "butted
heads" with Potter. O'Brien was informed that the July 16
meeting was his opportunity to address anything related to his
employment, but he did not mention asbestos at this meeting.
After the meeting, O'Brien was sent a letter stating that his
employment was terminated. The letter stated that his "inabil-
ity to cooperate with [his] supervisors, inefficient work per-
formance and lack of punctuality show poor judgment, respect
and conscientiousness; all of which are essential functions of
[his] position."

Based on the above evidence presented by BPS, we deter-
mine that BPS articulated a legitimate reason for terminating
O'Brien's employment based on his poor job performance.
BPS met its burden.

*O'Brien's Failure to Present
Evidence of Pretext.*

Once BPS articulated a legitimate and permissible reason
for terminating O'Brien's employment, the burden shifted
back to O'Brien, and O'Brien was required to present evi-
dence showing that BPS' proffered explanation for firing him
was merely pretextual. See *Riesen v. Irwin Indus. Tool Co.*,
272 Neb. 41, 717 N.W.2d 907 (2006). Because the case was
decided on summary judgment, we give O'Brien the favor-
able inferences from the evidence, and we must determine
whether O'Brien presented evidence to create a genuine issue
of fact for the fact finder. O'Brien's evidence, when viewed

in the light most favorable to him as the nonmoving party, needed to create an inference in reasonable minds that BPS had retaliatory motives for firing him and that the explanation for terminating O'Brien was pretextual. O'Brien presented no such evidence.

[12] In employment law involving alleged impermissible termination, a "pretext" is found when the court disbelieves the reason given by an employer, allowing an inference that the employer is trying to conceal an impermissible reason for its action. See *Riesen v. Irwin Indus. Tool Co., supra*, citing *Ryther v. KARE 11*, 108 F.3d 832 (8th Cir. 1997). In *Smith v. Allen Health Systems, Inc.*, 302 F.3d 827 (8th Cir. 2002), involving alleged discrimination, the Eighth Circuit Court of Appeals stated that although strong evidence of a prima facie case of discrimination can also be considered to establish pretext, proof of pretext or actual discrimination requires more substantial evidence. The rationale expressed in *Smith* applies to the instant case decided on summary judgment. In the present case involving an alleged impermissible termination, O'Brien offered no material evidence supporting an inference of pretext in his prima facie case or in his rebuttal.

The appellate courts in Nebraska have previously considered pretext, and we refer to them for guidance. In *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 587, 546 N.W.2d 827, 830 (1996), a retaliatory discharge case, an African-American employee, who was not in proper uniform, was asked by a manager, "'Where's your smock at, boy?'" The employee claimed that calling him "'boy' was 'a polite way of calling me a nigger.'" *Id*. The next day, the employee called the employer's headquarters and registered a complaint. The employee was fired 2 weeks later for reporting to work 3 hours late. The employee filed a claim with the Nebraska Equal Opportunity Commission (NEOC) based on having been fired allegedly in retaliation for complaining to headquarters or otherwise opposing an unlawful practice. The NEOC dismissed the claim, and the district court affirmed the NEOC's ruling. On appeal, the Court of Appeals determined that the district court did not err when it determined that the employee's complaint was properly dismissed by the NEOC. Despite the temporal proximity

between the complaint regarding the statement and the termination, the NEOC had determined that even if the employee established a prima facie case, the explanation given by the employer was not pretextual. The evidence showed that the employee had arrived at work 3 hours late, was fired by an individual not involved in the incident, and had been late on other occasions. The employee did not present evidence tending to negate the employer's evidence.

Unlike the outcome in *Rose*, in *Riesen v. Irwin Indus. Tool Co.*, 272 Neb. 41, 717 N.W.2d 907 (2006), we considered an appeal which had been decided on summary judgment and determined that the inferences from an employer's action terminating the employment of its employee was potentially a pretext for impermissible termination precluding summary judgment. In *Riesen*, the employee filed an action against his former employer alleging that he was fired in retaliation for filing a workers' compensation claim. The employer claimed the employee was terminated for misrepresenting his past employment on his employment application. The employee presented evidence showing that there had been no similar disciplinary actions for other employees. Additionally, we noted evidence of statements allegedly made by the employer which tended to support an inference that the employer's proffered reason for the employee's termination was pretextual. The employer's several negative comments regarding the employee included: "'The little son of a bitch is faking and he only did this to get his raise'"; "'it would be a lot easier on all of [them] if [the employee would] just quit'"; and "'"[y]ou *finally* messed up . . . you lied on your *work comp* application."'" *Id.* at 54-55, 717 N.W.2d at 918-19 (emphasis in original). Viewing the evidence in a light most favorable to the employee, we determined that a genuine issue of material fact existed as to whether the reason proffered by the employer for the termination of the employee's employment was a pretext for an impermissible termination.

In the present case, O'Brien contends that BPS' reasons for firing him are pretextual. In this regard, he points to two factors: (1) the temporal proximity between reporting suspected asbestos and being fired and (2) his suggestion that in prior

years, his work was satisfactory. As to temporal proximity, O'Brien relies on the period between his reports of potential asbestos and his termination and contends that such proximity "alone should be enough to generate a material issue of material fact as to the issue of pretext." Memorandum brief for appellant in support of petition for further review at 8. We do not agree. Just as in *Rose v. Vickers Petroleum*, 4 Neb. App. 585, 546 N.W.2d 827 (1996), the mere temporal proximity between O'Brien's reports of suspected asbestos and his firing does not overcome BPS' specific, direct, and considerable evidence regarding poor job performance. Unlike *Riesen v. Irwin Indus. Tool Co., supra*, where the employee pointed to several negative statements regarding the employee made by the employer, O'Brien has presented no such evidence, circumstantial or direct, and he further acknowledges that asbestos was not mentioned in the meetings with BPS prior to his firing.

O'Brien also contends that a genuine issue of material fact exists as to whether BPS' explanation was pretextual, because he claims that he performed his job in a positive manner in the years prior to his termination of employment. O'Brien indicates that he received three annual evaluations during the time he was employed by BPS from 2006 to July 2009. O'Brien stated that he had received positive annual evaluations regarding his job performance until the yearend review in July 2009, although the prior evaluations are not in the record.

Viewing the evidence in the light most favorable to O'Brien, and even assuming his annual evaluations prior to July 2009 were satisfactory in the sense that his employment was not terminated earlier, it does not necessarily follow that his yearend evaluation covering June 30, 2008, to June 30, 2009, which is squarely at issue in this case, must also be positive. In fact, the evidence and O'Brien's admissions regarding the current year are to the contrary.

In his deposition, O'Brien admitted that reliability and punctuality were his "biggest downfalls" and that he believed he was being fired for his aggressive behavior. O'Brien's deposition with respect to the July 7, 2009, meeting regarding his evaluation contains the following colloquy:

[Counsel for BPS:] Did you believe you were being terminated at that interview — I mean evaluation?

[O'Brien:] Did I believe I was being terminated?

[Counsel for BPS:] At that evaluation on July 7th, 2009.

[O'Brien:] Yes. I thought I was on my way out.

[Counsel for BPS:] And why was that?

[O'Brien:] Because of the conversation I had with the contractor that I worked with on my last project with BPS.

. . . .

[Counsel for BPS:] And what did that contractor tell you?

[O'Brien:] That . . . Blomenkamp had told him that they had pulled me off that project, my last project was a Nature Outdoor Explore Classroom because of my — that I was aggressive, my attitude, aggressive attitude.

O'Brien testified that he recorded the July 16, 2009, meeting with Blomenkamp and Townsend without their knowledge. O'Brien's deposition contains the following colloquy with respect to the July 16 meeting:

[Counsel for BPS:] I'm going to read a [transcribed] quote that was stated on the recording No. 2 at 2720, quote, I know that me and [Potter] have butted heads a few times along the way. Those are areas I need to work on for sure as well as I believe reliability that goes along with punctuality are my biggest downfalls I believe as an employee for [BPS] that I need to address.

[O'Brien:] That sounds right, yes.

We also note that asbestos was not mentioned by O'Brien or BPS representatives at any of the July meetings prior to his termination.

In sum, O'Brien did not present any evidence the inference from which created a genuine issue as to whether BPS' evidence articulating the permissible reason of poor job performance was a pretext for an impermissible termination. Thus, the district court did not err when it granted summary judgment in favor of BPS, and the Court of Appeals did not err when it affirmed this ruling.

CONCLUSION

For the reasons explained above, O'Brien failed to present evidence of a genuine issue of material fact that the permissible reason of poor job performance articulated by BPS for his termination was a pretext; therefore, BPS is entitled to judgment as a matter of law. The Court of Appeals did not err when it affirmed the district court's order granting summary judgment in favor of BPS.

Affirmed.

————————————

State of Nebraska ex rel. Counsel for Discipline
of the Nebraska Supreme Court, relator,
v. James E. Connor, respondent.
___ N.W.2d ___

Filed December 12, 2014.    No. S-13-963.

1. **Disciplinary Proceedings: Appeal and Error.** In attorney discipline and admission cases, the Nebraska Supreme Court reviews recommendations de novo on the record, reaching a conclusion independent of the referee's findings.
2. **Disciplinary Proceedings.** To determine whether and to what extent discipline should be imposed in a lawyer discipline proceeding, the Nebraska Supreme Court considers the following factors: (1) the nature of the offense, (2) the need for deterring others, (3) the maintenance of the reputation of the bar as a whole, (4) the protection of the public, (5) the attitude of the respondent generally, and (6) the respondent's present or future fitness to continue in the practice of law.
3. ____. Each attorney discipline case must be evaluated individually in light of its particular facts and circumstances. In addition, the propriety of a sanction must be considered with reference to the sanctions imposed in prior similar cases.

Original action. Judgment of suspension.

Kent L. Frobish, Assistant Counsel for Discipline, for relator.

Thomas J. Anderson, of Thomas J. Anderson, P.C., L.L.O., and Tim J. Kielty for respondent.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.